UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ROBERT BROAD,

                    Plaintiff,

v.

THE HOME DEPOT U.S.A., INC., et al.,

                    Defendants.

**Civil Action No. 14-771 (SRC)**

**OPINION**

<u>**CHESLER**</u>, District Judge

This matter comes before the Court upon the motion for summary judgment filed by Defendants Home Depot U.S.A., Inc. ("Home Depot"), Brock Darby and Scott Matthews (collectively, "Defendants"). Plaintiff, Robert M. Broad ("Plaintiff" or "Broad"), has opposed the motion. The Court has considered the papers filed by the parties. For the reasons that follow, the motion for summary judgment will be granted in part and denied in part.

**I.    BACKGROUND**

Plaintiff alleges that Home Depot terminated his employment after approximately 22 years of service because of his age and in retaliation for complaining about mistreatment and age discrimination. The following facts are generally not in dispute. Plaintiff started with Home Depot as a sales associate in 1991 and rose through the ranks to become a Regional Pro Sales Manager. (DSOF ¶ 2.) The Pro Sales organization is Home Depot's business-to-business division that targets professional contractors and government agencies. (*Id.* ¶ 3.) As a Regional Sales Manager, Broad managed and supervised Pro Account Representatives ("PARs") in his region who were responsible for developing business relationships with prospective and existing clients. Plaintiff

1

instructed the PARs in sales development and ensured that they complied with initiatives from division leaders and from Home Depot's headquarters in Atlanta. (*Id.* ¶ 6.)

Over the years, Broad received positive performance reviews lauding his and his team's accomplishments. Broad was acknowledged for being "#1 in the company" in various metrics, building "unparalleled" levels of trust in the store, putting "customers and associates first," and being a passionate leader. (PSOF Reply ¶¶ 28, 48, 55, 67, 81, 105, 116.) The tradeoff for his fervent drive, however, was that coworkers and supervisors sometimes perceived him as intense and confrontational, describing him as "bully-like," "very, very loud and disruptive," "abrasive and abrupt[.]" (DSOF ¶¶ 59, 71.) Defendants recounted various incidents of aggressive interactions that allegedly devolved to screaming and cursing. (*See, e.g.*, *Id.* ¶¶ 59, 71-75, 86, 95-101.) Plaintiff's areas of improvement, as reflected in his performance reviews, consistently touched on his communication skills, in sum, stating that "Rob's passion and competitive spirit are so great at times it comes at the cost of his business relationships[.]" (*Id.* ¶ 49.)

Broad's supervisors state that they have had numerous discussions with Broad about such concerns. (*Id.* ¶¶ 43, 111, 156.) Defendants have also assigned Plaintiff two mentors to, among other things, help him learn how to manage relationships, Gaven Gregory, from Strategic Business Development and Thomas Spahr, then Vice President of Learning and Human Resources. (DSOF ¶¶ 69, 112; PSOF Reply ¶ 69.) Broad's 2012 review notes that he "has attended [c]oaching with finesse and has worked with Tom Spahr as a mentor to consistently seek feedback and gain a better understanding how to navigate the complexity of our organization." (PSOF Reply ¶ 116.)

In the beginning of 2013, Broad's immediate supervisor Frank Paras and Regional Vice President Tony Lemma approached Broad about assuming a new National Pro Sales Manager position, created to secure contracts with state and local governments. (DSOF ¶ 136; Paras Dep.

49:3-11.) They assured Plaintiff that his salary and bonus computation, then set at a maximum of 50% of base salary, would remain unchanged. (DSOF ¶ 137.) If the pilot proved successful, they told Broad that Home Depot would expand the role to each of its three divisions (Northern, Southern, and Western). (*Id.* ¶¶ 138, 162.) Broad accepted. His new supervisor became Director of Strategic Accounts, Defendant Scott Matthews, who in turn reported to Marc Brown, then Senior Director of Pro Operations. (*Id.* ¶ 140-141.) Over the next several months, Broad worked to implement the contract acquisition plan for each state. (PSOF ¶ 13.)

      *a. Comments About Broad's Age*

Broad highlights three interactions concerning his age. Brown welcomed Broad to the team by saying, "[w]e're very excited about having you . . . . It's nice . . . when an old-timer like me and you who have been around a long time . . . gets to be able to do another position." (DSOF ¶ 148.) Initially, Broad did not make much of this comment. (Broad Dep. 219:22-220:3.)

Around August 2013, Broad had two conversations with Matthews. On a car ride from a visit to a customer in New York, they talked about work. Marc Brown was promoted to Regional Vice President. (DSOF ¶ 142.) Plaintiff states that Matthews hoped to replace Brown, but the job was offered to Defendant Brock Darby instead. (Broad Dep. 498:1-8; DSOF ¶ 142.) Matthews told Broad that "old-timers [who] have been around for a long time and getting older and making a lot of money" needed to create "positions and programs that nobody else knew"; otherwise, they "would be gone." (Broad Dep. 498:10-20.)

Matthews allegedly made a similar statement while talking with Broad in the evening after a business meeting in Atlanta at a hotel bar. (*Id.* 246:18-20.) Moments later, "from left field," Matthews asked what Tony Lemma and Frank Paras said to Broad about his pay. (*Id.* 246:24-

247:4.) Disturbed that the question came up, Broad asked if they were thinking about changing it. Mathews said no. (*Id.* 247:9-16.)

### b. Bonus Reduction and Reinstatement

The next day, however, Broad received an invitation to a conference call with Darby and Matthews during which Darby informed Broad that his maximum bonus opportunity will be reduced from 50% to 25% of his base salary. (DSOF ¶ 166.) Home Depot decided to expand the National Pro Sales Manager position to two more people, and, Darby allegedly said, could not afford to bring them in at Plaintiff's pay because he was making too much money. (Broad Dep. 230:22-231:10.)

Upset by the breached promise about his compensation, Broad complained to Joe McFarland. When told that he was being treated "differently" because other people whose positions changed amidst the restructuring were either given more money or grandfathered in, Broad, on McFarland's advice, reached out to senior management. (Broad Dep. 238:7-239:15; Kelly Decl. Ex. G.) Senior Human Resources Manager Jennifer Hepp allegedly told Broad that he was lucky his pay was not also cut. (Broad Dep. 257:9-11.) Darby's supervisor, Vice President of Pro Operations JT Rieves, however, wrote to Broad that his compensation will be reinstated until the end of the year: "Not a Rob thing but a company change and not a punishment. After all these years you earn the benefit of the six months grandfathering[.]" (Brady Decl. Ex. 25.) Going forward, Rieves wrote, "will be on you and your performance under the new terms. . . . Manage your intensity, work the role well, ring big sales and write the good book for more National Sales members." (*Id.*) Broad committed to deliver. (*See Id.*)

4

### c. *Disciplinary Record and Reprimands*

Less than two weeks later, Plaintiff received a mid-year check-in from Matthews. (DSOF ¶ 173.) The review criticized Broad for failing to meet sales plan, and again for continued problems with "team work and listening," which Matthews noted, have been ongoing issues "for [Broad's] past 8 reviews." (Brady Decl. Ex. 26.)

Within another two weeks, Plaintiff received a "Progressive Disciplinary Notice" (*i.e.*, counseling) documenting three events that occurred over the month of September. (*Id.* Ex. 30.) First, Matthews reprimanded Broad about his handling of a customer e-mail. On September 4, 2013, Matthews asked Plaintiff to confirm that he will be attending an upcoming tradeshow at the request of a customer. In his response, Plaintiff copied the customer and marketing contractor Lyn Alvarado stating, "Yes booth number 4 same answer from back in june thanks" [sic]. (Brady Decl. Exs. 27, 30.) Matthews found the email tone and the inclusion of the customer unacceptable. (DSOF ¶ 179.) The remaining grievances were lodged by Alvarado, who was upset about Broad's "scolding" manner in speaking with her, and the fact that Broad told her "very bluntly" not to approach Matthews with issues or questions without first going through Broad. (*Id.* ¶¶ 180-183.) The disciplinary note, dated September 25, 2014, emphasized that "Rob must . . . improve his organizational skills and . . . ensure he is staying on top of things and maintaining professionalism at all times when dealing with internal and external business partners[.]" (Brady Decl. Ex. 30.)

Finally, on September 30, Broad received a manager's note blaming him for failing to send invitations to a conference call that forced the organization to delay the Texas roll-out. Matthews wrote that this was "a large project miss on Rob's part as a project leader." (*Id.* Ex. 35.) Broad challenged the factual basis for all these actions, characterizing them as deliberate efforts by

Matthews and Hepp (who was involved with drafting the notices) to discredit his performance. (*See* PSOF ¶ 62; PSOF Reply ¶ 185.)

### d. Complaints to Human Resources

Concerned about the write-ups, Broad reached out to Human Resources. On September 25, 2013, Broad texted Tom Spahr about the counseling being "retaliation for [his] pushing back on the bonus[.]" (Brady Decl. Ex. 38.) Broad expressed frustration that Hepp's write-up was "not even accurate but . . . just ended [his] career[.]" (*Id.*) During a phone call with Spahr, Broad testified, he said that "there was discrimination." (PSOF ¶ 64.) Spahr replied that he was "on the case," and directed Plaintiff's concerns to Darby, who he said, should get in touch with Broad. (Brady Decl. Ex. 38; Broad Dep. 395:2-13, 436:1-5.) Broad also discussed his apprehensions with Scott Pollinger and Bob Silk, telling them that the counseling was "totally bogus" and in retaliation for "pushin[g] back on Jennifer Hepp." (Broad Dep. 400:11, 402:16-17.) "[T]hey changed the position . . . and I . . . pushed back [about] why I was being treated differently . . . and it got approved, and I think that Jennifer was not happy . . . and this is retaliation from that." (*Id.* 402:18-24.) Broad also testified telling Silk and Pollinger that "they're trying to just push me out of my position because of my age and my pay[.]" (*Id.* 402:2-3, 403:7-10.) Silk and Pollinger suggested that Broad should contact Spahr. (PSOF ¶ 63; Silk Dep. 108:15-25.)

Darby did not call Broad. Spahr contacted Hepp's boss, Human Resources Director James Watson. Broad spoke with Watson on October 8, 2013, about the new position, his concerns about Matthews's lack of leadership, the pay cut, the reviews, his worries about Matthews "twisting things," and Matthews's comments about Broad's age. (Broad Dep. 444:12-448:21.) Watson told Plaintiff that he would look into it.

   *e. Termination*

At the time of his discussion with Watson, Plaintiff did not know that Watson was already considering a request for severance. (PSOF ¶ 66.) Around October 3, 2013, Hepp and others began discussing a severance offer. (Hepp Dep. 232:10-25.) Hepp, Rieves, and Darby approved the request, which was submitted to Watson on October 8, 2013. (DSOF ¶ 198; Brady Decl. Ex. 37.) In addition to citing the September 4, 2013, informal coaching about the customer email, the September 25, 2013, counseling notice, and the September 30, 2013, manager's note about the Texas conference call, the request highlighted two other incidents. On July 29, 2013, it noted that "Matthews addressed with Rob his poor communication skills, poor team work and listening skills." (*Id.*) On October 2, 2013, it said that Broad spoke with Molly Umphrey, an hourly Pro Coordinator, about a customer order. "Molly indicated that Rob was short and rude to her," making her "visibly upset after the call. Again, this demonstrates Rob's unacceptable and unprofessional behavior in the workplace. A common theme in Rob's last several reviews[.]" (*Id.*) Watson inquired into these accusations. (PSOF ¶ 68, DSOF ¶¶ 213-223.) Broad told him that he did not know who Molly Umphrey was, nor recall the conversation. (PSOF ¶ 80.)

On October 24, 2013, Watson forwarded the request for approval to Vice President of Human Resources Tim Hourigan. (DSOF ¶ 224.) The next day, Hourigan approved. (PSOF ¶ 85.) On November 4, 2013, Darby informed Plaintiff of his termination. (*Id.* ¶ 95.) Plaintiff was replaced by Rochelle Komlosi. At the time of termination, Plaintiff was fifty years old. Komlosi was approximately twelve years younger[1] than Plaintiff, and Matthews testified, earned "[p]robably a hundred grand" less. (*Id.* ¶¶ 96-98.)

---

[1] Defendants contest the admissibility of evidence about Komlosi's age because Plaintiff obtained it from Komlosi's Linked-In profile, which Defendants claim is inadmissible hearsay. However, evidence introduced at the summary judgment stage does not have to be produced in a form that would be admissible at trial. *Celotex*, 477 U.S. at 327. The Court may consider hearsay evidence if the Plaintiff could later present that evidence in an admissible form.

7

**II.    DISCUSSION**

### A. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

---

*Williams v. West Chester*, 891 F.2d 458, 466 n.12 (3d Cir. 1989). Plaintiff should have no trouble being able to do that here.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir.2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014). However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B. Age Discrimination

Plaintiff first alleges that he was terminated in order to make room for younger employees in violation of the New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A.* 10:5-1 *et seq.* To prevail on a claim under NJLAD for age discrimination, a plaintiff must "show that the prohibited consideration[, age,] played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 207 (1999). In the absence of direct evidence of age discrimination, the Court applies the three-step burden-shifting framework set forth initially in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to

9

> prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations and quotation marks omitted). To establish a prima facie cause of action under NJLAD, the plaintiff may demonstrate that he (1) belongs to a protected class, (2) was qualified for the position in question, (3) suffered an adverse employment action, and (4) was replaced by a candidate sufficiently younger to permit an inference of age discrimination. *Spinks v. Twp. of Clinton*, 402 N.J. Super. 465, 482 (N.J. Super. Ct. App. Div. 2008). Plaintiff has satisfied this burden. Plaintiff had been employed by Home Depot for 22 years over the course of which he has received positive performance reviews, rating him "Outstanding," "Top Performer," and, at worst, "Valued Associate." (DSOF ¶¶ 28, 80, 104.) Plaintiff was replaced by a person twelve years his junior. A few months preceding his termination, his supervisor told him that "old-timers [who] are . . . getting older and making a lot of money" needed to create "positions and programs that nobody else knew"; otherwise, they "would be gone." (Broad Dep. 498:10-20.) Viewed in the light most favorable to the Plaintiff, these facts can give rise to an inference of unlawful age discrimination. *Arenas v. L'Oreal USA Prods., Inc.*, 790 F. Supp. 2d 230, 235 (D. N.J. 2011).

In response, Defendants marshal more than enough evidence of a nondiscriminatory reason for termination. Defendants present Plaintiff as a successful performer, but one whose aggression and tensions in building workplace relationships, *e.g.*, being "confrontational," "overwhelming," failing to "demonstrate respect and appreciation for . . . others," eventually outweighed the value he brought to the team. (*See, e.g.*, DSOF ¶¶ 38, 49, 50, 84, 106.) Six supervisors and numerous co-workers and subordinates across Broad's positions as both a Regional and National Manager complained about Broad's interpersonal skills. Defendants claim that dating back to 2011, they

decided to "tak[e] a stance" with plaintiff, because he "clearly [was] not hearing" their criticisms about his relationship issues. (DSOF ¶ 103.) In 2012, Defendants state that they considered termination, but offered Broad a new position instead. (*Id.* ¶¶ 133, 134.) When the same problems persisted under a new manager, with whom Plaintiff "had no previous problems or issues," Hepp testified that she sought approval for a severance package in July 2013, after Matthews complained to her about Broad's communication challenges. (*Id.* ¶¶ 150, 158-160; Brady Decl. Ex. 21.) Defendants finally fired Plaintiff in November. (DSOF ¶ 150.)

The burden now shifts back to Plaintiff who must come forward with some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fakete v. Aetna*, 308 F.3d 335, 338 n.3 (3d Cir. 2002) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). The plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow the factfinder to infer that each of the employer's proffered nondiscriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action. *Fuentes*, 32 F.3d at 764.

The duration of Plaintiff's problematic behavior, viewed in the light most favorable to the Plaintiff, may give a fact-finder pause in concluding that conduct previously tolerated for approximately eight years provided the actual basis for termination. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[i]t is . . . questionable why a company would fire the only salesperson to receive consecutive annual bonuses in response to the same organizational deficiencies that the employer had tacitly accepted for over two decades."); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (fact that "[plaintiff] had been kept on as a supervisor for 14 years despite his abrasive personality and because of his ability to

11

produce" may allow jury to "conclude that . . . [employer's] proffered justification was . . . pretextual."). Complaints about Broad's interpersonal skills appear amongst numerous performance awards and accolades, lauding Plaintiff for being "consistently on top of every metric[.]" (PSOF Reply ¶ 28.) Nor were Plaintiff's successes limited to just accomplishing sales goals. His leadership and teamwork were also commended in reviews praising him for developing his team, being "above all managers in 7 out of 8 [leadership essentials]," being a "tactical leader, with a deep understanding of the regional dynamics," building "a level of trust within the store that is unparalleled," and "keep[ing] his customers and associates first." (*Id.* ¶¶ 28, 37, 48, 55, 81, 105.) Defendants characterize Plaintiff's new job assignment effectively as a step in managing Plaintiff's behavior (a last opportunity to reinvent himself). But Plaintiff's last supervisor as Regional Manager, Frank Paras, testified that Marc Brown, then Senior Director of Pro Operations, brought the possibility of transfer to Paras's attention because Brown thought that "Rob would be a great fit for [the] role [that] revolves around his level of expertise" with government. (Paras Dep. 49:3-10.) Paras stated that was the first time he discussed a position change for Broad and did not consider any other person, agreeing with Brown that "Rob had the skills to do that job." (*Id.* 49:14-15, 52:14-21.) Even under new management, Plaintiff continued to receive recognition for his work. (PSOF ¶ 13; DSOF Reply ¶ 13; Broad Dep. 400:15-23.)

Plaintiff's disciplinary record, which had amassed two formal citations in approximately just as many months preceding termination had previously been clean for over two decades. Although Defendants contest Broad's narrow focus on one among a bevy of performance-managing tools in Home Depot's arsenal, including performance reviews which clearly flagged issues for Plaintiff's attention, Hepp testified that an earlier attempt at termination had been rejected by Home Depot's Vice President of Human Resources, Carole Pietak, who told Hepp that

someone who is a performance management problem must be terminated in accordance with the procedures outlined in Home Depot's Standards of Performance, which establish a four-step progressive disciplinary process, rather than by severance package. (DSOF Reply ¶¶ 6, 10; Hepp Dep. 153:22-25.) It was not until Pietak left that the severance package was approved by Tim Hourigan, the new Vice President of Human Resources. The disciplinary steps have been compressed into an accelerated timeline and, at the time of termination, have not yet been completed. (PSOF ¶¶ 6, 10.) Broad also testified that he was not given an adequate opportunity to respond to the charges. (Broad Dep. 378:10-391:1.) This raises a factual dispute about Home Depot's compliance with internal procedures, which may be considered as evidence of pretext. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000). In light of what may be construed as procedural irregularities in the termination of Plaintiff's twenty-plus-year accomplished career, a jury may evaluate whether Matthews's comments that "old-times" who failed to create something that only they understood, "would be gone," (Broad Dep. 498:10-20), suggest an alternative reason for termination. Plaintiff has offered enough evidence to raise a factual dispute. The motion for summary judgment on his age discrimination claim under NJLAD will be denied.

### C. Retaliation

Plaintiff's Complaint also raises claims for wrongful retaliation under NJLAD and the New Jersey Conscientious Employee Protection Act ("CEPA"), *N.J.S.A.* 34:19-1 *et seq.*, alleging that Defendants retaliated against Plaintiff for complaining about age discrimination. Defendants argue that Plaintiff's NJLAD retaliation claim is waived by the CEPA waiver provision and that Plaintiff cannot establish a cause of action under CEPA. CEPA's waiver provision states that "the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and

remedies available under any other . . . State law[.]" *N.J.S.A.* 34:19-8.  The provision encompasses overlapping claims for relief under NJLAD that require a "finding of retaliatory conduct that is actionable under CEPA." *Young v. Schering Corp.*, 141 N.J. 16, 29 (1995).  But, the New Jersey Supreme Court has articulated that, in light of CEPA's purpose of enlarging protections against retaliatory discharge, the waiver must be narrowly construed.  *Id.* at 26-27.  Parallel claims for relief are not necessarily mutually exclusive if they can arise out of distinct protected conduct that is independent of a CEPA claim.  *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 556 n.9 (2013).  For this reason, in ruling on Defendants' previous motion to dismiss, the Court held that Plaintiff cannot be forced to elect a remedy until having had an opportunity to complete discovery. (Apr. 22, 2014, Op. at p. 8.)  Discovery being complete, Defendants again maintain that Plaintiff's failure to make an election before the commencement of summary judgment motion practice should effectuate a waiver.  The Court does not need to decide exactly when the waiver provision attaches because Plaintiff cannot establish that his termination was the result of retaliatory conduct by Defendants.

NJLAD makes it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act . . . ." *N.J.S.A.* 10:5-12(d). To establish a prima facie case of discriminatory retaliation, a plaintiff must demonstrate that: "(1) the employee engaged in a protected . . . activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."  A*bramson v. William Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001).

Plaintiff submits that his complaints to Scott Pollinger, Bob Silk, Tom Spahr, and James Watson about age discrimination precipitated his termination.  Defendants contend that Plaintiff's

14

communications do not amount to protected conduct because Plaintiff complained about his disciplinary record being created in retaliation for challenging his bonus reduction. To constitute protected conduct under NJLAD, Plaintiff's comments must express opposition to discrimination. *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006). The communication must explicitly or implicitly alert the recipient that age was the reason for the alleged unfairness. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995). The grievance must be specific. A "general complaint of unfair treatment" will not sustain a charge for illegal age discrimination. *Id.*

Amidst complaints about Hepp's retaliation for successfully reversing his bonus reduction, Plaintiff testified voicing his belief to Pollinger and Silk that he was being "push[ed] . . . out of [his] position because of [his] age and [his] pay." (Broad Dep. 402:1-3.) This statement articulates concern about age discrimination, even if made in context of a broader conversation about Broad's work environment. Plaintiff's communications with Spahr are more ambiguous – the only evidence implying the mention of age discrimination consists of Broad's testimony that he told Spahr over the phone that "there was discrimination." (PSOF ¶ 64.) Whether Plaintiff intended to report a concern about age discrimination or express his feeling that he was being treated differently because his compensation, unlike that of others, was not grandfathered, is unclear. Even accepting this statement as adequate, Plaintiff cannot establish a causal link between his termination and complaints.

There is no indication that Broad's articulated concerns about age discrimination influenced the decision makers involved in terminating his employment. Silk and Pollinger were Plaintiff's long-term colleagues who did no more than tell Plaintiff to call Spahr. (PSOF ¶¶ 73, 74.) There is no evidence that they relayed their communications with Broad to anyone who participated in Broad's termination. (*See* Broad Dep. 403:7-14 ("Q. Did you tell Bob Silk and Scott Pollinger

15

that you believed it was age discrimination[?] A. Yes.  Q. Did they respond at all to that?  A. I don't . . . think so. . . .  I think they were more upset that I got . . . a write-up."))  Spahr reached out to Darby and Watson, but there is no evidence that he conveyed anything more than the fact that Plaintiff disagreed with the counseling and wished to speak with someone about that.[2]  (Spahr Dep. 55:3-6; *see also* Darby Dep. 184:2-10 ("Rob expressed a concern to Tom.  His concern was, basically with all of these performance opportunities arising, something is going on").)  By the time Broad spoke with Watson directly and brought up the comments that were made about his age, Watson was already contemplating a severance package that Hepp, Rieves, and Darby began to prepare five days earlier.  (Broad Dep. 447:3-4; PSOF ¶ 66.)  This is not sufficient evidence to allow a reasonable decision maker to conclude that Broad's allegations of age discrimination were causally related to his termination.  The speculative chain of inferences that may be made does not have enough facts to keep it together.

The prima facie case under CEPA is similar.  Plaintiff must demonstrate that (1) the aggrieved employee reasonably believed that the employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.  *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2007).  There is no causal nexus on the evidence before the Court.

Plaintiff additionally attempts to carve out an independent CEPA cause of action arising out of his complaints to Joe McFarland and Jennifer Hepp about the breached promise to maintain his

---

[2] The conversation in which Broad mentioned discrimination may not have even occurred until after Spahr had spoken with Darby.  "Q. . . . [O]ther than you telling [Spahr] in this call, Hey, I haven't heard from Brock Darby yet, do you say anything else?  A. I just remember sayin[g] to him that . . . I was being retaliated against and there was discrimination."  (Broad Dep. 438:3-13.)

compensation. CEPA does not protect such conduct. The complained-of activity "must have public ramifications, and . . . the dispute between the employer and employee must be more than a private disagreement." *Maw v. Advanced Clinical Commc'ns, Inc.*, 179 N.J. 439, 445 (2004). Nothing about the reduction of Plaintiff's bonus, whether labeled fraud or otherwise, is of broader public concern. It is not actionable under CEPA. Thus, Defendants' motion for summary judgment on Plaintiff's retaliation claims under CEPA and NJLAD will be granted.

### D. Liability of Individual Defendants

Defendants argue that Matthews and Darby cannot be held individually liable for NJLAD violations – Matthews because it is impossible to aid and abet one's own conduct, and Darby because he was only tangentially involved. An individual may be personally liable for NJLAD violations, as it is unlawful "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under NJLAD.]" *Tarr v. Ciasulli*, 181 N.J. 70, 83 (2004) (quoting *N.J.S.A.* 10:5–12e). To face liability, a supervisory employee must give "substantial assistance or encouragement to the unlawful conduct of [the] employer." *Id.* (quoting *Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 129 (3d Cir. 1999), abrogated on other grounds) (alteration in original).

A supervisor may face aiding and abetting liability even if he is the principal enactor of the employer's wrongful conduct. *Hurley*, 174 F.3d at 126. Courts have conceded that this is an awkward theory of liability, but the alternative that would foreclose liability for a supervisor's discriminatory conduct while permitting liability for a person who encourages or facilitates the wrongful action of another would be "untenable" in light of NJLAD's "broad and pervasive" reach. *Rowan v. Hartford Plaza Ltd.*, 2013 WL 1350095, at * 7-8 (N.J. Super. Ct. App. Div. Apr. 5, 2013). Matthews may be individually liable for violating NJLAD. Plaintiff's claim against Darby also survives summary judgment given Darby's role in evaluating and recommending Plaintiff's

termination. Accordingly, Defendants' motion for summary judgment as to the individual Defendants will be denied.

### E. Punitive Damages

Finally, Defendants argue that Broad is not entitled to punitive damages because he cannot demonstrate that "the offending conduct [was] especially egregious." *Baker v. Nat'l State Bank*, 161 N.J. 220, 223 (1999) (internal quotation marks omitted) (quoting *Rendine v. Pantzer*, 141 N.J. 292, 314). Plaintiff's failure to oppose the argument waived the issue. The Court will thus grant Defendants' motion for summary judgment on the issue of punitive damages.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion for summary judgment. The Court will grant Defendants' motion for summary judgment on Counts Four and Five of the Complaint alleging retaliation in violation of CEPA and NJLAD. The Court will also grant Defendants' motion for summary judgment on punitive damages. The Court will otherwise deny Defendants' motion. An appropriate Order will be filed.

                                               s/ Stanley R. Chesler
                                               STANLEY R. CHESLER
                                               United States District Judge

Dated: June 30, 2016